IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

WILLIAM G. REDMOND, III,
      Petitioner,

vs.                                 Case No.:  3:18cv1611/MCR/EMT

MARK S. INCH,
       Respondent.
_____/

## <u>REPORT AND RECOMMENDATION</u>

This cause is before the court on Petitioner's petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed an answer and relevant portions of the state court record (ECF No. 11).  Petitioner filed a reply (ECF No. 16).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B), (C) and Fed. R. Civ. P. 72(b).  After careful consideration of all issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is

further the opinion of the undersigned that the pleadings and attachments before the court show that Petitioner is not entitled to relief.

I.    BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 11).[1]  Petitioner was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2011-CF-6198, with two counts of sexual battery (Counts 1 and 2), one count of false imprisonment (Count 3), and one count of procuring another for prostitution (Count 4) (Ex. 3 at 3). Following a jury trial on September 6, 2012, Petitioner was found guilty as charged on Counts 1, 2, and 4, and guilty of the lesser included offense of assault as to Count 3 (Ex. 3 at 25, Ex. 4 at 36–192).   On November 20, 2012, the court sentenced Petitioner as a habitual felony offender to concurrent terms of twenty-five (25) years in prison on Counts 1 and 2, with pre-sentence jail credit of 328 days, and time served on Counts 3 and 4 (Ex. 3 at 42–70, 84–91).

Petitioner, through counsel, appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D12-5691 (Ex. 5).   The First DCA

---

[1] Hereinafter all citations to the state court record refer to the exhibits submitted with Respondent's answer (ECF No. 11).  If a cited page has more than one page number, the court cites to the "Bates stamp" page number.

affirmed the judgment per curiam without written opinion on January 23, 2014 (Ex. 8). *Redmond v. State*, 130 So. 3d 231 (Fla. 1st DCA 2014) (Table). The mandate issued February 10, 2014 (Ex. 9).

On January 22, 2015, Petitioner, through counsel, filed a motion for post-conviction relief in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure (Ex. 12 at 20–43). The court held an evidentiary hearing on one of Petitioner's four claims (Ground 3) on March 18, 2016 (*id.* at 156–78). The state court denied Petitioner's Rule 3.850 motion in an order rendered on March 24, 2016 (Ex. 13 at 211–18). Petitioner appealed the decision to the First DCA, Case No. 1D16-1790 (Exs. 14, 16). The First DCA affirmed the circuit court's decision in an opinion issued on April 5, 2018 (Ex. 18). *Redmond v. State*, 242 So. 3d 1199 (Fla. 1st DCA 2018). The mandate issued May 3, 2018 (Ex. 19).

Petitioner filed the instant federal habeas action on July 30, 2018 (ECF No. 1).

## II.    TIMELINESS

Respondent contends the § 2254 petition is untimely (ECF No. 11 at 18–20). A one-year period of limitation applies to the filing of a habeas petition by a person in custody pursuant to a state court judgment. *See* 28 U.S.C. § 2244(d)(1). The limitation period runs from the latest of:

(A)   the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)   the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).  The time during which a properly filed application for state post-conviction or other collateral review is pending is not counted toward the one-year federal limitations period.  *See* 28 U.S.C. § 2244(d)(2).

Here, Petitioner's conviction became final on April 23, 2014, upon expiration of the 90-day period for him to seek certiorari review of the state court judgment in the United States Supreme Court.  *See Chavers v. Sec'y, Fla. Dep't of Corr.*, 468 F.3d 1273, 1275 (11th Cir. 2006).  The federal limitations period commenced the next day, on April 24, 2014.[2]

---

[2] Federal Rule of Civil Procedure 6(a) provides that "[i]n computing any period of time prescribed or allowed by . . . any applicable statute, the day of the act, event or default from which

Petitioner, through counsel, properly filed a Rule 3.850 motion on January 22, 2015, after **273 days** of the federal limitations period passed.  Respondent contends the Rule 3.850 motion was not "pending," for purposes of . § 2244(d)(2), during the period between the date of rendition of the circuit court's decision denying the Rule 3.850 motion (March 24, 2016) and the date Petitioner filed a notice of appeal of that decision (April 19, 2016) (ECF No. 11 at 20).[3]  However, it is well settled that where a Florida petitioner appeals the circuit court's denial of a post-conviction application, the application remains pending until issuance of the mandate by the state appellate court.  *See Nyland v. Moore*, 216 F.3d 1264, 1267 (11th Cir. 2000).  Therefore, Petitioner's Rule 3.850 motion was pending from January 22, 2015, to May 3, 2018, the date of the First DCA's mandate.  The federal limitations period resumed the next day, on May 4, 2018, and ran only **87 days** until Petitioner filed his § 2254 petition on July 30, 2018.  Because only 360 days of the 365-day limitations period elapsed (**273 days** + **87 days** = **360 days**), Petitioner's § 2254 petition was timely filed.

---

the designated period of time begins to run shall not be included."  Fed. R. Civ. P. 6(a); *see also Washington v. United States*, 243 F.3d 1299, 1301 (11th Cir. 2001) (Rule 6 applies to calculation of one-year statute of limitations under AEDPA).

[3] There is no dispute that Petitioner's notice of appeal was timely filed, pursuant to Rule 9.110(b) of the Florida Rules of Appellate Procedure.

III.    STANDARD OF REVIEW

Federal courts may grant habeas corpus relief for persons in state custody

pursuant to 28 U.S.C. § 2254.  Section 2254(d) provides, in relevant part:

> **(d)**  An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court shall not be
> granted with respect to any claim that was adjudicated on the merits in
> State court proceedings unless the adjudication of the claim–
>
> > **(1)**  resulted in a decision that was contrary to, or involved
> > an unreasonable application of, clearly established Federal law,
> > as determined by the Supreme Court of the United States; or
> >
> > **(2)**    resulted in a decision that was based on an
> > unreasonable determination of the facts in light of the evidence
> > presented in the State court proceeding.

28 U.S.C. § 2254(d) (2011).

The United States Supreme Court explained the framework for § 2254 review

in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).  The

appropriate test was described by Justice O'Connor as follows:

> Under the "contrary to" clause, a federal habeas court may grant the
> writ if the state court arrives at a conclusion opposite to that reached by
> this court on a question of law or if the state court decides a case
> differently than this Court has on a set of materially indistinguishable
> facts.  Under the "unreasonable application" clause, a federal habeas
> court may grant the writ if the state court identifies the correct
> governing legal principle from this Court's decisions but unreasonably
> applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Employing the *Williams* framework, on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a state court proceeding, the federal court must first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" only when a Supreme Court holding at the time of the state court decision embodies the legal principle at issue. *Thaler v. Haynes*, 559 U.S. 43, 47, 130 S. Ct. 1171, 175 L. Ed. 2d 1003 (2010); *Woods v. Donald*, — U.S. —, 135 S. Ct. 1372, 1376, 191 L. Ed. 2d 464 (2015) ("We have explained that clearly established Federal law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of this Court's decisions." (internal quotation marks and citation omitted)).

After identifying the governing legal principle(s), the federal court determines whether the state court adjudication is contrary to the clearly established Supreme Court case law. The adjudication is not contrary to Supreme Court precedent merely because it fails to cite to that precedent. Rather, the adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases.

*See Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002). Where there is no Supreme Court precedent on point, the state court's conclusion cannot be contrary to clearly established federal law. *See Woods*, 135 S. Ct. at 1377 (holding, as to claim that counsel was per se ineffective in being absent from the courtroom for ten minutes during testimony concerning other defendants: "Because none of our cases confront the specific question presented by this case, the state court's decision could not be contrary to any holding from this Court." (internal quotation marks and citation omitted)). If the state court decision is contrary to clearly established federal law, the federal habeas court must independently consider the merits of the petitioner's claim. *See Panetti v. Quarterman*, 551 U.S. 930, 954, 127 S. Ct. 2842, 168 L. Ed. 2d 662 (2007).

If the "contrary to" clause is not satisfied, the federal habeas court next determines whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The federal court defers to the state court's reasoning unless the state court's application of the legal principle(s) was "objectively unreasonable" in light of the record before the state court. *Williams*, 529 U.S. at 409; *see Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004) (per curiam). In applying this standard, the Supreme Court has emphasized:

> When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong.  Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted).

*Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)).

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2).   The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable application" clause, the federal court applies an objective test.  *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.").  Federal courts "may not characterize . . . state-court factual determinations as unreasonable merely because we would have reached a

different conclusion in the first instance." *Brumfield v. Cain*, — U.S. —, 135 S. Ct. 2269, 2277, 192 L. Ed. 2d 356 (2015) (quotation marks omitted).

When performing review under § 2254(d), the federal court presumes that all factual determinations made by the state court are correct. 28 U.S.C. § 2254(e)(1). The petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *Id.*; *see, e.g.*, *Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by the AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence").

Only if the federal habeas court finds that the petitioner satisfied § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claim. *See Panetti*, 551 U.S. at 954. Even then, the writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). "If this standard is difficult to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

Within this framework, the court will review Petitioner's claims.

IV.   PETITIONER'S CLAIMS

A.    Ground One:    "The trial court erred in overruling the Petitioner's objections to the victim advocate's detailed testimony of the sexual assault exam preformed [sic] on the alleged victim and the prosecutor's repeated references to "rape" and "rape kit" as the testimony [sic] and comments were highly inflamatory [sic] and prejudicial, as well as irrelevant, violating the Petitioner's Fifth, Sixth, and Fourteenth Amendments [sic] of the United States Constitution."

Petitioner contends the prejudicial effect of the testimony of Valeria Slevin, regarding the procedures employed during the victim's "sexual kit examination," outweighed its probative value, and was thus inadmissible under Florida Statute § 90.403 (ECF No. 1 at 4–6).    Petitioner asserts the trial court questioned the cumulative nature of Ms. Slevin's testimony, since the victim also described the examination, and the court noted that "at some point" the State may "run into 403 problems," yet the court allowed the testimony (*id.*).    Petitioner contends the prejudicial effect of Ms. Slevin's testimony was exacerbated by the prosecutor's repeated use of the terms "rape" and "rape kit" during closing arguments (*id.*). Petitioner contends the trial court's evidentiary ruling violated his federal due process rights (*id.*).

Respondent concedes Petitioner exhausted Ground One in the state courts by presenting it on direct appeal (ECF No. 11 at 21).    Respondent contends Petitioner failed to demonstrate that the trial court abused its discretion in determining that the

probative value of Ms. Slevin's testimony outweighed its prejudicial effect (*id.* at 25–27).

### 1.    Clearly Established Federal Law

Federal courts generally do not review a state court's admission of evidence in habeas corpus proceedings.  *See Lisenba v. California*, 314 U.S. 219, 228, 62 S. Ct. 280, 86 L. Ed. 166 (1941) ("We do not sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence."). Indeed, in a habeas corpus action brought by a state prisoner, the federal court's authority is "severely restricted" in the review of state evidentiary rulings.  *See Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."); *Sims v. Singletary*, 155 F.3d 1297, 1312 (11th Cir. 1998) (declining to review state court's denial of a mistrial based on a witness's reference to the petitioner's "mug shots" because the admission did not render the trial fundamentally unfair); *Tejada v. Dugger*, 941 F.2d 1551, 1561 (11th Cir. 1991) (refusing to review admission of evidence of the defendant's prior bad acts because,

in light of substantial evidence of his guilt, the evidence was not material to conviction and thus did not deprive him of a fundamentally fair trial).

For federal habeas relief, an evidentiary ruling must have affected the fundamental fairness of a trial. *See Lisenba*, 314 U.S. at 228 (holding that habeas relief is warranted only when the error "so infused the trial with unfairness as to deny due process of law."); *Estelle*, 502 U.S. at 75 (holding that habeas relief was not warranted because neither the introduction of the challenged evidence, nor the jury instruction as to its use, "so infused the trial with unfairness as to deny due process of law"); *see also Sims*, 155 F.3d at 1312

2.      Federal Review of State Court Decision

Petitioner presented Ground One on direct appeal (Ex. 5). The First DCA affirmed the judgment of conviction without written opinion (Ex. 8).

"[T]he summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002); *see also Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").

The theory of defense at Petitioner's trial, according to the opening statement of defense counsel, Attorney Katherine O'Connell, was that the sexual acts between Petitioner and the victim, who was an admitted prostitute, were consensual; and the only reason the victim reported the sexual contact to law enforcement was because she was angry that Petitioner had not paid her $20 to perform the sex acts (Ex. 4 at 52–54).

The victim testified that in the early morning hours of December 12, 2011, she was attempting to prostitute herself (Ex. 4 at 75–76). She testified Petitioner picked her up in a red Geo Tracker and offered her drugs in exchange for sex (*id.* at 76). The victim testified she told Petitioner she accepted only money for sex, and she told him it would cost $20 for either a "blowjob" or intercourse (*id.* at 77). The victim testified Petitioner drove her to his house and another house, stating that his money was there, but he did not get any money (*id.* at 77–78). The victim testified Petitioner told her he would drop her off where he had picked her up, but when she opened the car door to exit, Petitioner pulled her back into the vehicle by her hair (*id.* at 79–80). The victim testified she thought, "Oh, crap, I'm going to die" (*id.* at 79). She testified she did not believe she could safely escape (*id.* at 80). The victim testified Petitioner continued to drive around, and indicated he was going to get oral sex and intercourse regardless of whether or not the victim wanted to give it to him

(*id.*).   The victim testified she told Petitioner she had children, and she begged Petitioner to let her go (*id.*).   The victim testified Petitioner pulled his penis out of his pants and told her to give him oral sex (*id.* at 80).   The victim testified Petitioner then stopped the car and said he wanted to have intercourse (*id.* at 82).   The victim testified she was crying and asked Petitioner to stop (*id.*).   She testified he told her to get on top of him in the driver's seat, and they had vaginal intercourse (*id.* at 82–83).   The victim testified Petitioner then said he wanted more oral sex, so she complied (*id.* at 83–84).   She testified Petitioner then had vaginal intercourse with her a second time (*id.* at 84).   The victim testified she complied with Petitioner's demands, because she wondered if Petitioner would let her go, and hoped that he would not beat her up or kill her (*id.* at 84).   She testified she did not believe she could escape, because Petitioner was physically larger than her, and she believed he could outrun her or hit her with his car if she got out of the car (*id.* at 84–85).   The victim testified Petitioner finally dropped her off where he originally picked her up, and he asked for her phone number (*id.* at 85–86).   The victim testified she gave Petitioner her phone number and told him to leave his number on her phone (*id.*).   She testified she did this because she intended to provide Petitioner's phone number to law enforcement, and she did (*id.*).

The victim testified she contacted a law enforcement officer and was escorted to Sacred Heart Hospital (Ex. 4 at 88–89). The victim testified she was given a "rape test kit" (*id.* at 89). The victim testified this entailed medical personnel removing her clothing, swabbing her vaginal walls, swabbing her mouth, and drawing blood (*id.* at 89). The victim testified this was done in the presence of two people (*id.*).

On cross-examination, Attorney O'Connell, elicited the victim's testimony that Petitioner told her he did not have any money, yet she willingly went with him to his house to pick up money (Ex. 4 at 95). Attorney O'Connell also elicited testimony that the victim did not attempt to yell out to any police officers, even though police officers were commonly in the Brownsville area, where Petitioner was driving her around (*id.* at 103). Attorney O'Connell elicited testimony that the victim complained that Petitioner was taking too long to ejaculate, but the victim then clarified she was complaining not because it was taking too long, but because she was "having to do it" (*id.* at 104–05)

On re-direct, the prosecutor elicited testimony that Petitioner did not ask the victim to have sex with him, rather, he told her to do it (Ex. 4 at 108–09). The victim testified she did not feel she had any option than to do it (*id.* at 109). The victim testified she never consented to have sex with Petitioner (*id.*). The victim testified she never had a sexual assault examination prior to that night (*id.*). The prosecutor

asked the victim if she reported the incident to law enforcement because she was mad at Petitioner for not paying her, and the victim testified, "No. . . . I waived [sic] down law enforcement because I was mad that I was forced to do something I did not want to do." (*id.* at 111).

Valeria Slevin testified she was a victim's advocate with the Escambia County Sheriff's Department (Ex. 4 at 122). Ms. Slevin testified she met the victim at Sacred Heart Hospital on December 12, 2011 (*id.* at 123). Ms. Slevin testified she talked with the victim about how she was feeling, informed her about follow-up testing, provided her referrals for counseling, and stayed with the victim throughout the forensic examination, which is known as a "sexual assault kit" (*id.* at 123–24). The prosecutor asked Ms. Slevin to describe how the sexual assault kit was performed (*id.* at 124). Attorney O'Connell objected, without stating the grounds for the objection, but the trial court overruled the objection (*id.* at 124–25). Ms. Slevin testified:

> A. During—for the kit they have to examine—it's fairly invasive for the individual that's going through it. But they have to check them over from head to toe. So they have to disrobe so that they can see if there's any further injuries that aren't visible, like under their clothing and so forth.

> Q. So the actual victim has to strip all their clothes off; is that correct?

A.  Correct.

(Ex. 4 at 125).

Attorney O'Connell again objected, but this time she stated grounds for the objection:

> MS. O'CONNELL:  I don't see how this is relevant to prove the truth of what he's asserting.  And at this point all it's doing is inflaming the jury toward feeling sorry for her because she had to go through this. And it's—there's just no relevance and he's trying to inflame the jury.

> MR. CARAWAY [the prosecutor]:  Judge, it's—she was present during the sexual assault kit when they were doing it.  She's describing what this victim went through.  It's a sexual battery case.  I think it's relevant to what the defense is arguing that she did all this for $20.

> MS. O'CONNELL:   Additionally, he's already asked [the victim] what happened during the sexual assault exam and got an answer from her, so it's been asked and answered.

> MR. CARAWAY:  Well—

> THE COURT:  I guess my question is this, isn't this cumulative of what she's already testified to?

> MR. CARAWAY:  She just testified that she actually did—she's describing the procedures that go on.  The victim doesn't recall everything.

> THE COURT:  All right.  I'm going to—

> MS. O'CONNELL:  I mean, I just don't see how there's any relevance as to what she had to do at the hospital other than just to inflame the jury to feel sorry for her.

THE COURT: I don't think it's inflaming. It's the fact that what's been put at issue is she's lied so I'm gonna [sic] overrule the objection at this time. But let's wrap this up.

. . . .

At some point we're going to run into 403 problems. So what's going to be your next line of questioning?

MR. CARAWAY: Explain what they do in a sexual assault exam. I'm just getting her to explain the procedure. I think it's relevant in a sexual battery case.

THE COURT: I'm going overrule the objection at this time.

(Ex. 4 at 125–27).

Ms. Slevin's testimony continued:

A. . . . They have them stand and take their clothes off so that they can examine their body.

Q [by the prosecutor]. And do they do—when they do swabbings, can you describe to the jury what that is?

A. They take some swabs from the inside of the cheek to verify, I guess, the DNA of the victim. In addition to that, they have the victim undergo what's the equivalent of like a pap smear. They insert a speculum and they take swabs from the inside of their vagina and sometimes also from their anal area.

Q. And is there any other testing done besides these swabbings?

A. I believe they take some samples so that they can do testing for STDs and just, I mean, I guess the routine medical. I'm not a hundred percent sure of exactly what else they may test the victim for while they are there. But they do have blood drawn and they go through a certain medical procedure in addition to the examination.

Q. And how many people were present while this was going on?

A. Would have been myself and the doctor performing the forensic exam.

(Ex. 4 at 127–28). Ms. Slevin testified that during the "sexual assault kit," the doctor also combed the victim's pubic hair to collect any hairs that may have come off the suspect (*id.* at 129).

Petitioner contends the prejudicial effect of Ms. Slevin's testimony regarding the sexual assault kit procedures was exacerbated by the prosecutor's use of the term "rape" and "rape kit" during closing arguments. The prosecutor made first and last closing arguments (Ex. 4 at 144–62). He used the term "rape" in his first closing argument, and the context of his references was the following:

Now, for the State, this case comes down to the one issue of consent, and that's whether or not you believe [the victim] in this case. Now, there's also some statements by [the victim], and I'd ask you to look at those with care. Did she get pulled in and her ponytail was up or was her hair down? Is that an inconsistency? Or I couldn't remember? You heard her from the stand today, what she said, she couldn't remember. This is back in 2012—or 2011 of December she couldn't remember if her hair was up or down. That's not a material issue in this case. She said when I went to or when he drove around to get the money, stopped at the residence, another gentleman came out. Did he say hey or did he waive [sic]? Again, not an inconsistency. Just a misstatement or a variation of the same. And there's no time line that this case is all about. Whether Ms. Orvis remembers 3:00, 2:30 or 4:00, that's not an issue in the case. Why can't she pinpoint the exact time? She had just been raped. We're not thinking about is her hair up or down, or did it happen at 3:00 or 2:30 or 4:00. You heard that after this

happened she immediately flagged down the first law enforcement officer she went to.  That's the first officer transported her to the hospital.  And that's where they do the rape kit.

You've heard from [the victim] that never before has she ever gone through a rape kit.  It's the first time.  You heard intrusive, stripped down naked, people swabbing your—the inside of her vagina, cervical area, coming her pubic hair.

The State's going to ask you to look at this evidence.  Look at what matches up.  Look at what the defendant said to law enforcement, I don't know her.  Never seen her before.  Show him a picture, never seen her before.  Use your common sense in deciding what evidence is reliable in this case.

Going through a rape kit—

MS. O'CONNELL:  Objection.  Your Honor, can we approach?

(At the bench:

MS. O'CONNELL:  Your Honor, the crime is not rape.  It's sexual battery.  It's not called a rape kit.  It's called a sexual assault exam.  I'd object to continuing to use rape over and over.

MR. CARAWAY:  I think we're fully entitled to use the word rape.  That's exactly what it is.

THE COURT:  I'm going overrule the objection.

(Bench conference concluded)

MR. CARAWAY:  Stripping down going through a rape kit. Coming down here time after time to the State Attorney's Office, to meet with the public defender, subpoenaed here to trial.  All that for $20 dollars?  Use your common sense.

(Ex. 4 at 147–49).   The prosecutor continued his initial closing arguments; then Attorney O'Connell made her closing arguments; and the prosecutor made his second closing arguments (*id.* at 149–62).   The prosecutor made no other references to "rape" or a "rape kit" (*id.*).

Under Florida law, "[r]elevant evidence is evidence tending to prove or disprove a material fact." Fla. Stat. § 90.401.   The trial court has broad discretion in determining the relevance of evidence.   *See Heath v. State*, 648 So. 2d 660, 664 (Fla. 1994).   "Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence."   Fla. Stat. § 90.403. However, "[m]ost evidence that is admitted will be prejudicial or damaging to the party against whom it is offered.   The question under the statute is not prejudice but instead, unfair prejudice."   *State v. Williams*, 992 So. 2d 330, 334 (Fla. 3d DCA 2008) (internal quotation marks and citation omitted).

Under Florida law, the standard for reviewing prosecutorial comments is the following:

> Wide latitude is permitted in arguing to a jury.   Logical inferences may be drawn, and counsel is allowed to advance all legitimate arguments.   The control of comments is within the trial court's discretion, and an appellate court will not interfere unless an abuse of such discretion is shown.   A new trial should be granted when

> it is "reasonably evident that the remarks might have influenced the jury
> to reach a more severe verdict of guilt than it would have otherwise
> done." Each case must be considered on its own merits, however, and
> within the circumstances surrounding the complained-of remarks.

*Breedlove v. State*, 413 So. 2d 1, 8 (Fla. 1982) (quoting *Darden v. State*, 329 So. 2d 287, 289 (Fla. 1976)) (other citations omitted). The prosecutor may not "'inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant rather than the logical analysis of the evidence in light of the applicable law.'" *Jones v. State*, 612 So. 2d 1370, 1374 (Fla. 1993) (quoting *Bertolotti v. State*, 476 So. 2d 130 (Fla. 1985)). This state rule is essentially the same as the federal due process standard governing allegedly improper argument by the prosecution. A prosecutor may argue both facts in evidence and reasonable inferences from those facts. *See Tucker v. Kemp*, 762 F.2d 1496, 1506 (11th Cir. 1985) (citations omitted). But if the evidence is too insubstantial to support a reasonable inference, the prosecutor's comment will be deemed improper. *Id.* at 1507. Prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury may reasonably draw from it and the impermissible practice of arguing suggestions beyond the evidence. *See United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992) (citation omitted).

"[T]he limits of proper argument find their source in notions of fairness, the same source from which flows the right to due process of law." *Houston v. Estelle*, 569 F.2d 372, 380 (5th Cir. 1978). Thus, to establish prosecutorial misconduct, a two-prong test must be satisfied: (1) the prosecutor's comments must have been improper; and (2) the comments must have prejudicially affected the substantial rights of the defendant. *See United States v. Wilson* , 149 F.3d 1298, 1301 (11th Cir. 1998); *Dessaure v. State*, 891 So. 2d 455, 464–65 (Fla. 2004) (an order granting mistrial is required only when the error upon which it rests is so prejudicial as to vitiate the entire trial, making a mistrial necessary to ensure that the defendant receives a fair trial). "A defendant's substantial rights are prejudicially affected when a reasonable probability arises that, but for the remarks, the outcome of the trial would be different." *Wilson*, 149 F.3d at 1301 (internal quotations and citation omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Eyster*, 948 F.2d 1196, 1207 (11th Cir. 1991).

The First DCA did not unreasonably deny relief on Ground One. Ms. Slevin's testimony regarding the rather invasive procedures used during sexual assault examinations was relevant to the issue of the victim's credibility and her motive for reporting the sexual assaults. The defense propounded the theory that the sex acts

were consensual, and the victim "cried wolf" to law enforcement only because she was angry that Petitioner did not pay her $20 for the sex.  And the defense attempted to impeach the victim's credibility by pointing out differences in her trial testimony and her prior statements to law enforcement and counsel.  The prosecutor offered Ms. Slevin's testimony to show that it was unreasonable to suggest that a person would undergo the examination procedures simply because she was cheated out of $20.  Though Ms. Slevin's testimony was somewhat cumulative of the victim's, Ms. Slevin's description of the sexual assault procedures was a bit more detailed than the victim's, and Ms. Slevin was a more objective source of the information.  It was not unreasonable to conclude that the probative value of Ms. Slevin's testimony was not substantially outweighed by the danger that Petitioner would be convicted based upon the jury's sympathy for the victim instead of the evidence.  With respect to the prosecutor's references to "rape" and "rape kit" in his initial closing argument, the comments were permissible inferences from the evidence, and they did not render Petitioner's trial fundamentally unfair.

Petitioner has failed to demonstrate that the First DCA's rejection of Ground One was contrary to or an unreasonable application of clearly established Supreme Court law.  Therefore, Petitioner is not entitled to federal habeas relief on Ground One.

Case No.:  3:18cv1611/MCR/EMT

B.    Ground Two:   "Petitioner's defense counsel rendered ineffective assistance for requesting a sentencing hearing be continued, which prejudiced the Petitioner by allowing the State to file a habitual felony offender notice that resulted in a longer sentence violating the Petitioner's Fifth, Sixth, and Fourteenth Amendment [sic] of the United State Constitution."

Petitioner alleges at the conclusion of trial on September 6, 2012, the court and the State were prepared to proceed with sentencing, but defense counsel requested additional time to review the scoresheet prepared by the State, because Petitioner indicated that some of the prior felonies indicated on the scoresheet did not belong to him (ECF No. 1 at 7–9).  Petitioner alleges the court continued the sentencing, which enabled the State to file, on September 14, 2012, a notice of intent to seek habitual felony offender sentencing (*id.*).   Petitioner alleges if defense counsel had proceeded with sentencing on September 6, 2012, the State could not have sought the sentencing enhancement, because it had not filed the requisite notice (*id.*).  Petitioner contends he received an enhanced sentence as a result of counsel's alleged deficiency (*id.*).

Respondent asserts an exhaustion defense (ECF No. 11 at 22).  Respondent concedes Petitioner presented Ground Two in his Rule 3.850 motion and appealed the issue to the First DCA.  Respondent contends Petitioner could have sought review of the First DCA's written opinion in the Florida Supreme Court, but he failed to do so (*id.*).  Respondent alternatively contends Petitioner is not entitled to habeas

relief on Ground Two, because the First DCA's rejection of the claim was not contrary to or an unreasonable application of clearly established federal law (*id.* at 28–29).

The court rejects Respondent's exhaustion argument. Though exhaustion of state remedies requires a petitioner to invoke appellate review, a petitioner is not required to invoke extraordinary remedies when those remedies are alternatives to the standard review process, and where the state courts have not provided relief through those remedies in the past. *O'Sullivan v. Boerckel*, 526 U.S. 838, 844, 119 S. Ct. 1728, 144 L. Ed. 2d 1 (1999) (citing *Wilwording v. Swenson*, 404 U.S. 249, 249–50, 92 S. Ct. 407, 30 L. Ed. 2d 418 (1971)). The petitioner is only required to give the state courts one full opportunity to resolve any constitutional issues by invoking "one complete round of the State's established appellate review process." *Boerckel*, 526 U.S. at 845. If state rules give a petitioner the "right . . . to raise" the federal claim in the state supreme court, then the petitioner must seek such review. *Id.* at 845–46. But a petitioner does not need to seek review in a state court of last resort when that court has discretionary control over its docket. *Id.* at 844.

In *Boerckel*, the United States Supreme Court held that the state rules of Alabama required a defendant to appeal the judgment of conviction to the Alabama Court of Criminal Appeals, and then file a petition for certiorari review in the

Alabama Supreme Court.  Florida's rules are materially distinguishable.  Florida's

established, normal review process for claims presented in a Rule 3.850 motion and

rejected in a final order of the state circuit court is an appeal to the district court of

appeal.  *See* Fla. R. App. P. 9.030(b)(1)(A), 9.141(b).  Florida's appellate rules do

not give a prisoner a "right  . . . to raise" Rule 3.850 claims in the Supreme Court of

Florida except in enumerated circumstances, none of which are present here.  *See*

Fla. R. App. P. 9.030(a).  Thus, in a non-capital case, a Florida prisoner need not

seek review of his Rule 3.850 claims in the Supreme Court of Florida to satisfy the

federal exhaustion requirement.  *See Williams v. Wainwright*, 452 F.2d 775, 776–77

(5th Cir. 1971); *see also, e.g., Cenecharl v. Sec'y, Fla. Dep't of Corr.*, No.

1:14cv137/WS/GRJ, 2016 WL 7972106, at \*6 (N.D. Fla. Dec. 9, 2016), *Report and*

*Recommendation Adopted by* 2017 WL 343642, at \*1 (N.D. Fla. Jan. 23, 2017)

(unpublished but recognized as persuasive authority).

Petitioner satisfied the exhaustion requirement.  Therefore, the court will

determine whether Petitioner has satisfied § 2254(d) with respect to Ground Two.

### 1.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set

forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674

(1984).  To obtain relief under *Strickland*, Petitioner must show (1) deficient

performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 687–88. If Petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was reasonable considering all the circumstances and under prevailing professional norms." *Strickland*, 466 U.S. at 688–89, 691. "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one." *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)). "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "[T]here are no 'absolute rules' dictating what reasonable performance is . . . ." *Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (quoting *Chandler*, 218 F.3d at 1317). Indeed, "'[a]bsolute rules would interfere with counsel's independence—which is also constitutionally protected—and would restrict the

wide latitude counsel have in making tactical decisions.'" *Id.* (quoting *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001)).

If the record is not complete regarding counsel's actions, "then the courts should presume that what the particular defense lawyer did at trial—for example, what witnesses he presented or did not present—were acts that some lawyer might do." *Jones*, 436 F.3d at 1293 (citing *Chandler*, 218 F.3d at 1314–15 n.15). "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994). Counsel's performance is deficient only if it is "outside the wide range of professional competence." *Jones*, 436 F.3d at 1293 (citing *Strickland*, 466 U.S. at 690); *Lancaster v. Newsome*, 880 F.2d 362, 375 (11th Cir. 1989) (emphasizing that petitioner was "not entitled to error-free representation").

As to the prejudice prong of the *Strickland* standard, Petitioner's burden of demonstrating prejudice is high. *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002). To establish prejudice, Petitioner must show "that every fair-minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting

*Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). And Petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695. The prejudice assessment does "not depend on the idiosyncracies [sic] of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Id.* at 695.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). "Establishing that a state court's application of *Strickland*

was unreasonable under § 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at

788.  As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both
> "highly deferential," and when the two apply in tandem, review is
> "doubly" so.  The *Strickland* standard is a general one, so the range of
> reasonable applications is substantial.   Federal habeas courts must
> guard against the danger of equating unreasonableness under *Strickland*
> with unreasonableness under § 2254(d).  When § 2254(d) applies, the
> question is not whether counsel's actions were reasonable.   The
> question is whether there is any reasonable argument that counsel
> satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

> 2.     Federal Review of State Court Decision

Petitioner presented this claim of ineffective assistance of trial counsel

("IATC") as Ground 1 of his Rule 3.850 motion (Ex. 12 at 30–35).  The state circuit

court adjudicated the claim as follows:

> After the verdict was published, the Court asked the parties if they were
> prepared for sentencing.  Defense counsel said that they were not ready
> because of issues with the scoresheet.[FN 6]  Specifically, defense
> counsel noted that Defendant was disputing some of the eleven felony
> convictions the State had listed on his scoresheet.  The Court, in
> response, continued sentencing.
>
> [FN 6:  T at 190–192, attached as Exhibit F.]
>
> On September 14, 2012, the State informed Defendant that it was
> seeking to have him sentenced as an Habitual Felony Offender
> (HFO).[FN 7]  Defense counsel objected to the enhanced sentence,
> stating that the notice was not timely.

[FN 7: Hearing, attached as Exhibit G.]

At sentencing, on November 20, 2012, defense counsel again objected to an HFO sentence because the notice was untimely.[FN 8] The Court, however, allowed the State to proceed with the HFO sentence. The Court found that Defendant qualified as an HFO based on his prior convictions and sentenced him to 25 years in prison for both counts of sexual battery. The sentences were ordered to run concurrent [sic]. Defendant was also sentenced to time served for assault and for procuring another for prostitution. Defendant's judgment and sentence were affirmed on appeal and the mandate was issued on February 10, 2014.

[FN 8: Sentencing transcript, 1–28, attached as Exhibit H.]

Defendant is now alleging that his attorney was ineffective as a matter of law and that his conviction should be vacated due to counsel's errors. A claim of ineffective assistance of trial counsel is reviewed under the test as outlined in Strickland v. Washington, 466 U.S. 668 (1984). Under this standard, a defendant is not entitled to relief unless he can show that his attorney's performance was both deficient and that he was prejudiced by the alleged deficiency. In order to demonstrate prejudice under Strickland, a defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

**Ground I**—In his first ground, Defendant claims that counsel erred in having the sentencing hearing continued, thereby allowing the State an opportunity to seek an HFO sentence. Defense counsel, immediately after Defendant's trial, said that they were not prepared to go forward with sentencing due to a dispute about the scoresheet. Defense counsel informed the Court that Defendant was concerned that some of the prior offenses counted on his scoresheet were erroneous. The Court said that it would continue sentencing so that defense counsel could examine the scoresheet further.

> The Court finds that Defendant's claim must fail as he cannot show that defense counsel committed any error. Because Defendant insisted that some of the prior convictions were not his, defense counsel reasonably sought additional time to examine the scoresheet. Although the State subsequently sought HFO sanctions, the Court finds that counsel's initial request for more time was not ineffective assistance of counsel. This claim, accordingly, is denied.

(Ex. 13 at 213–15). Petitioner argued this issue on appeal to the First DCA (Ex. 16 at 15–23). The First DCA affirmed the circuit court's decision in a written opinion, but the court did not comment on this particular IATC claim (Ex. 18).

In *Wilson v. Sellers*, — U.S. —, 138 S. Ct. 1188 (2018), the Supreme Court held that where there has been one reasoned state judgment rejecting a federal claim followed by a later unexplained order upholding that judgment or rejecting the same claim, federal habeas courts employ a "look through" presumption. The *Wilson* Court described this presumption as follows:

> We hold that the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

138 S. Ct. at 1192.

The state court's factual findings with respect to what occurred at the conclusion of trial, at the hearing on September 14, 2012, and at the sentencing hearing on November 20, 2012, are supported by the state court record (Ex. 13 at 282–331). Considering the fact that Petitioner had indicated to Attorney O'Connell that the State had erroneously attributed prior convictions to him on the scoresheet prepared by the prosecutor, the state court reasonably applied *Strickland* in concluding that O'Connell acted reasonably by requesting additional time to investigate the offenses attributed to Petitioner on the scoresheet. Petitioner is not entitled to federal habeas relief on Ground Two.

C.    Ground Three: "Petitioner's defense counsel rendered ineffective assistance for failing to properly impeach the victim with her prior inconsistent statements, violating the Petitioner's Fifth, Sixth, and Fourteenth Amendment [sic] of the United State Constitution."

Petitioner contends Attorney O'Connell was ineffective for failing to properly impeach the victim's trial testimony with her prior inconsistent statements to law enforcement (ECF No. 1 at 10–12). Petitioner alleges the victim testified she quoted Petitioner a price of $20 for oral sex or intercourse; however, according to the police report, the victim told law enforcement "they agreed upon a price for oral sex" (*id.* at 10). Petitioner further alleges the victim testified Petitioner called her cell phone while she was still in the vehicle with him; however, she told law enforcement

Petitioner called her "after he left her" (*id.* at 10–11).  Petitioner contends the victim's lack of credibility was the basis for his defense, and if Attorney O'Connell had impeached the victim with these two prior inconsistent statements, there is a reasonable probability the outcome of trial would have been different (*id.* at 12).

Respondent asserts the same exhaustion defense as asserted in Ground Two (ECF No. 11 at 22).  Respondent alternatively contends the state court's adjudication of this IATC claim was not contrary to or an unreasonable application of clearly established federal law (*id*. at 29–31).

For the reasons discussed *supra* in Ground Two, the court rejects Respondent's exhaustion defense.

### 1.    Clearly Established Federal Law

The *Strickland* standard, set forth *supra*, governs this claim.

### 2.    Federal Review of State Court Decision

Petitioner presented this IATC claim as Ground 2 of his Rule 3.850 motion (Ex. 12 at 35–38).  The state circuit court adjudicated the claim as follows:

> **Ground II**—Defendant argues that defense counsel did not conduct an adequate cross-examination of the victim.  Specifically, Defendant claims that the victim should have been crossed-examined on inconsistencies between statements she made to police and later at trial.

At trial, Defendant points out that when asked what kind of sex Defendant first asked for, the victim said "it could have been a blowjob, or, you know, intercourse." In the police report, Defendant writes, the victim stated they "agreed to a price for oral sex."[FN 9]  In addition, Defendant writes that the victim testified she intentionally gave him her phone number and had him "leave his phone number on my phone for the reason of turning him in." The victim also testified that Defendant called her when she was in his vehicle. In the police report, the victim was reported to have said that Defendant called her [a]fter he left her . . . ."

[FN 9:  Police report, attached as Exhibit I.]

As noted, in order to demonstrate error under Strickland a defendant must demonstrate prejudice to such an extent that, absent the error, there is a reasonable probability that the outcome of the proceeding would have been different. The Court has examined alleged errors cited by Defendant and finds that the minor inconsistencies were not of such a magnitude that the outcome of the proceeding would have changed had they been brought to the attention of the jury. Since Defendant cannot show prejudice, this claim is denied.

(Ex. 13 at 215–16). Petitioner argued this issue on appeal to the First DCA (Ex. 16 at 23–27). The First DCA affirmed the circuit court's decision in a written opinion, but the court did not comment on this particular IATC claim (Ex. 18).

Based upon review of Attorney O'Connell's cross-examination of the victim, the state court reasonably concluded Petitioner failed to show he was prejudiced by O'Connell's performance. The arrest report was included in the state court record (Ex. 13 at 332–36). The arrest report included the following description of the victim's statements to law enforcement:

On 12/12/11 victim [ ] reported to the ECSO that while she was working as a prostitute, she was picked up by a white male whom she had never met. She described this person as a white male, 6'2"–6'5", light color hair, driving a small red SUV. She believed his name was "John." They agreed upon a price for oral sex; however, after the male drove around for a while he could not produce the money. She said that two off [sic] the houses that he went to looking for money were in the area of 65th and Jackson, but she did not know the exact address. She asked him to let her out and she tried to get out, but he pulled her back into the car by her hair. He forced her to give him oral sex and took her to a secluded area, where he forced her to participate in vaginal intercourse. He used a condom at first, but then removed it before ejaculating. After he left her, he called her and she obtained his phone number at 850-[ ]. She flagged down a deputy on patrol and reported the incident. She participated in a sexual assault exam, and her panties and a condom wrapper were collected from the scene.

(Ex. 13 at 334).

On direct examination, the victim testified as follows with respect to the

money-for-sex agreement:

Q. Now, once he offers drugs for sex, what do you say?

A  I said I do not accept drugs for sex. Only money.

Q. And what type of sex are we talking about here?

A.  He did not specify, you know, but he—you know it could have been a blowjob or, you know, intercourse.

Q. And did you quote him a price for how much it would cost?

A.  Yes, I did.

Q. What was that?

      A.  Twenty.

      Q.  And 20 for—$20?

      A.  $20.

      Q.  And for either or?

      A.  Either or, yes.

(Ex. 4 at 77).

With respect to the phone call, the victim testified:

And on the way back to the bus stop he's acting as if though [sic] everything was fine, you know, asking for my phone number and how he was going to straighten me out and, you know, bring me money another day and, you know, things to that effect.  And I intentionally, you know, gave him my phone number.  My phone number was not really active.  I didn't have minutes on it, but I was able to check my voice mail through another phone if I needed to.  And I had him to leave his phone number on my phone for the reason of turning him in.

(Ex. 4 at 85).

Attorney O'Connell did not question the victim about the type of sex she and Petitioner agreed upon.  However, O'Connell questioned the victim about the phone call as follows:

      Q.  So then would it be an accurate statement to say that, he, Mr. Redmond's phone had contacted your phone twice that day?

      A.  I never checked that message.  I had law enforcement check it.

Case No.:  3:18cv1611/MCR/EMT

Q.  Okay.

A.  'Cause [sic] I gave them the phone number and the code to check my record.

Q.  Okay.  Let me tell you—let me ask you, if I told you that phone call was made at 2:30 in the morning, not 4:30 in the morning, would you have a different opinion of that?

A.  Yes.

Q.  So would you say then that Mr. Redmond's phone was used to call your phone twice that day?

A.  I'm only aware of one time.  The time that he did so right there in the vehicle when I was in there.

Q.  Okay.  All right.  So Mr. Redmond picks you up between 3 and 3:30 in the morning, correct?

A.  Yes.

(Ex. 4 at 97).

The state court reasonably concluded Petitioner failed to show a reasonable probability of a different outcome of trial if Attorney O'Connell had attempted to impeach the victim about the type of sex agreed upon in the money-for-sex agreement, and whether the victim was inside Petitioner's car at the time he called her cell phone.  Any attempt to impeach the victim about the type of sex would have been unsuccessful, because the victim did not testify about the type of sex they

agreed upon; instead, she testified only that she offered oral sex or intercourse for $20.

With respect to the phone call, although Attorney O'Connell did not specifically question the victim about whether the phone call occurred before or after she left Petitioner's car, O'Connell's cross-examination raised questions about the victim's truthfulness regarding her telephone contact with Petitioner. Additionally, Attorney O'Connell questioned the victim about other prior inconsistent statements. For example, the victim testified Petitioner did not identify himself by name, but simply referred to himself as "that guy"; but O'Connell pointed out that the victim provided the name "John" to law enforcement (Ex. 4 at 93–95). O'Connell also questioned the victim about testimony which was inconsistent with her prior deposition testimony. For example, the victim testified she did not have any interaction with a man with whom Petitioner spoke when he stopped at his house looking for money; but O'Connell pointed out that during her deposition, the victim stated that the other man "said hi" (id. at 98–99). The victim also testified that Petitioner did not obey traffic control devices while he was driving; but O'Connell pointed out that during her deposition, the victim stated the opposite (id. at 100–01). The victim testified she was wearing a ponytail on the night of her encounter with Petitioner; but O'Connell pointed out that during her deposition, the victim stated

her hair was down (*id.* at 101–02).  The victim testified Petitioner did not ask her to insert her finger into his anus; but when O'Connell confronted her with the fact that medical staff swabbed her ring finger during the sexual assault examination, the victim admitted Petitioner may have asked her to touch his anal area (*id.* at 106–07).

Considering Attorney O'Connell's vigorous cross-examination of the victim on her prior inconsistent statements, there is no reasonable probability the jury would have rendered a different verdict if O'Connell had questioned the victim about the two subjects identified by Petitioner.

Petitioner has failed to establish that the state court's adjudication of Ground Three was contrary to or an unreasonable application of *Strickland*, or based upon an unreasonable determination of the facts.  Therefore, Petitioner is not entitled to relief on Ground Three.

>    D.    Ground Four:   "Petitioner's defense counsel rendered ineffective assistance for failing to object to the testimony of the State's expert witness Berenger Chan regarding the DNA testing when he was not qualified as an expert and he failed to provide any statistics to give meaning to DNA results."

Petitioner contends Attorney O'Connell was ineffective for failing to object to the State's failure to qualify Berenger Chan as an expert prior to his testifying regarding the results of his DNA testing of certain items of evidence (i.e., the victim's panties and evidence collected during the sexual assault examination) (ECF

No. 1 at 13–15). Petitioner also contends Attorney O'Connell was ineffective for failing to object to Mr. Chan's testimony regarding the results of his DNA testing, on the ground that the State failed to present expert testimony regarding population genetics or statistics to provide meaning to the DNA test results (*id.*).

Respondent asserts the same exhaustion defense as asserted in Ground Two (ECF No. 11 at 22). Respondent alternatively contends the state court's adjudication of this IATC claim was not contrary to or an unreasonable application of clearly established federal law (*id*. at 32–34).

For the reasons discussed *supra* in Ground Two, the court rejects Respondent's exhaustion defense.

1. Clearly Established Federal Law

The *Strickland* standard, set forth *supra*, governs this claim.

2. Federal Review of State Court Decision

Petitioner presented this claim as Ground 3 of his Rule 3.850 motion (Ex. 12 at 38–41). The state circuit court held an evidentiary hearing on this claim (*id.* at 156–79). The circuit court adjudicated the claim as follows:

> The next witness called by the State was Berenger Chan.[FN 5] Mr. Chan said that he worked for FDLE and that his job was to examine evidence for the presence of bodily fluids and attempt to generate a DNA profile. Mr. Chan said that he performed DNA analysis on evidence from Defendant's case. With respect to DNA taken from

vaginal [sic] swab of the victim, Mr. Chan testified that he detected the presence of three individuals.  Defendant was listed as a possible contributor.  Similarly, DNA taken from a cervical swab of the victim also identified Defendant as a possible contributor.  Mr. Chan also found Defendant's DNA from a swab of the victim's left cheek.  Lastly, Mr. Chan testified he obtained a DNA profile from the epithelial fraction of the victim's underwear.  Again, Defendant was listed as a possible contributor.

[FN 5:  T. at 112–118, attached as Exhibit E.]

. . . .

**Ground III**—Defendant, in his final ground, writes that defense counsel was ineffective for failing to object to the testimony of Berenger Chan.  Mr. Chan, an FDLE analyst, testified for the State that Defendant was a possible contributor of DNA evidence obtained from the victim's cheek, vagina, cervix, and underwear.  Mr. Chan said that he worked for FDLE in the Biology section.  Mr. Chan explained that his duties "are to examine items of evidence for the presence of biological materials . . . . "  Mr. Chan would then extract DNA from the material and attempt to generate a DNA profile to compare to a "known reference standard."  Mr. Chan had a bachelor's degree in biology from UC San Diego and a master's degree in forensic science from National University.

Brandon Caraway testified at the evidentiary hearing that he was the prosecutor in Defendant's case.  Mr. Caraway said he had reviewed the Defendant's file prior to his testimony.  Mr. Caraway said that defense counsel was provided a copy of Mr. Chan's report during discovery and also had taken his deposition.  A copy of Mr. Chan's deposition was entered into evidence.[FN 10]  At the deposition, Mr. Chan said that he was a crime laboratory analyst at FDLE and that his job was to examine evidence for the presence of biological material.  Mr. Chan then explained his findings in Defendant's case, which mirrored his testimony at trial.

[FN 10:  Deposition, attached as exhibit J.]

It is a defendant who has the burden of proof at an evidentiary hearing on a rule 3.850 motion.[FN 11]  Mr. Chan did not testify at the evidentiary hearing and Defendant did not offer any evidence that he was not an qualified [sic] to give opinion testimony regarding the DNA evidence presented at trial.  The Court finds that Defendant has failed to show how he was prejudiced by his attorney's failure to object to Mr. Chan when he has not shown such an objection would have been sustained.  Since there is no basis to conclude that Mr. Chan's testimony was impermissible, this claim is denied.

> [FN 11:  <u>Pennington v. State</u>, 34 So 3d 151 (Fla. 1st DCA 2010).]

Further, the Court finds that Defendant has failed to show that the outcome of the proceeding would have been different absent Mr. Chan's testimony.  The victim testified in specific detail about the attack.  She flagged down Deputy Barnhill soon after the attack and told him she had been sexually battered.  The victim subsequently identified Defendant from a photographic lineup.  Later, when Defendant was questioned by Deputy Barnhill about the incident on his cell phone, Defendant gave a fake name.  Since, even without the testimony of Mr. Chan, the outcome would have been the same, this claim is denied.

(Ex. 13 at 213, 216–17).

Petitioner presented this issue on appeal to the First DCA (Ex. 16 at 27–32).

The First DCA adjudicated the claim as follows:

> Following his four convictions—two for sexual battery, one for assault, and the last for procuring another for prostitution—William Redmond, III, alleged his trial counsel to be ineffective based on three grounds. The trial court denied all three grounds and, on appeal, we affirm.
>
> The victim, working as a prostitute, came to an agreement with Redmond to perform certain sexual activities for a set price.  However, it soon became apparent that Redmond had no money.  Redmond

refused to drop the victim off at her request, and, when she attempted to get out of his vehicle, he snatched her back in by her hair. He then made it clear that he was going to have sex with the victim whether she wanted to or not—and then he did. Redmond dropped the victim off at a bus stop after exchanging phone numbers; he wanted to bring her money another day. Law enforcement tracked the phone number to Redmond, who closely resembled the description given by the victim. He also happened to be in possession of the same vehicle described by the victim. When confronted with outgoing phone calls from his phone to the victim's, Redmond explained that someone likely took his phone in the middle of the night and called the victim, but quickly returned the phone to Redmond before he ever found out it was gone. The victim positively identified Redmond in a photo lineup.

The State presented the testimony of Berenger Chan from the Florida Department of Law Enforcement, who discussed his analysis of several DNA swabs taken from the victim; Chan found DNA of multiple individuals, excluding the victim. Redmond was excluded as a contributor to one sample, included as a possible contributor in several others, and a "match" to one partial DNA profile. A report of Chan's findings, including statistics of the likelihood that DNA found belonged to Redmond, was admitted into evidence without objection by the defense.

Following the trial, the court asked if the parties were prepared to proceed to sentencing. Redmond notified his counsel that some of the prior convictions on the criminal scoresheet were not his, but his brother's, and that he did not want crimes he did not commit to elongate his sentence. Defense counsel notified the trial court of the situation, and the court reset sentencing so the defense could fully investigate Redmond's criminal history. When Redmond returned to court for sentencing, he was served with a notice of intent to seek habitual felony offender sentencing, and subsequently sentenced as a habitual felony offender.

Redmond's postconviction motion alleged that his trial counsel was ineffective for three reasons: 1) she requested a continuance before

sentencing, allowing the State time to serve notice of its intent to seek habitual felony offender sentencing; 2) she failed to adequately impeach the victim with prior testimony; and 3) she failed to ensure that Chan was qualified to present DNA evidence. The trial court summarily denied the first two grounds, and we affirm as to these grounds without further comment. The trial court ordered an evidentiary hearing to hear Redmond's final claim.

To demonstrate ineffective assistance of counsel, a defendant must both: 1) overcome the presumption that his trial counsel's performance was not constitutionally deficient, and 2) show prejudice by way of a reasonable probability that the result would have been different absent this deficiency. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Bright*, 200 So. 3d 710, 730 (Fla. 2016); *Rutherford v. State*, 727 So. 2d 216, 220 (Fla. 1998).

At the hearing, Redmond argued that there was insufficient evidence at trial of Chan's qualifications, including any background working with statistics or genetics, any scientific publications authored, or his experience working with the database used to compute the probability statistics. In short, Redmond argued that he had no idea whether Chan was qualified or not.

The trial prosecutor testified that Redmond's trial counsel had deposed Chan prior to trial, and questioned him extensively on his qualifications and analysis. Because Redmond's counsel was aware of Chan's sufficient experience and qualifications, the prosecutor assumed, she did not make useless pro forma objections, especially as the theory of defense was not identification.

The trial court denied Redmond's claim, finding that he presented no evidence that Chan was unqualified or that any trial objections would have been sustained, and thus, that his trial counsel was ineffective. We agree. In simply arguing that he did not know whether or not Chan was qualified, Redmond proved neither deficiency nor prejudice by his trial counsel.

AFFIRMED.

(Ex. 18).  *Redmond v. State*, 242 So. 3d 1199, 1200–01 (Fla. 1st DCA 2018).

The state court reasonably applied *Strickland* in determining that the burden was on Petitioner to prove that there was a reasonable probability the trial court would have sustained an objection to Mr. Chan's testimony, on the ground that he was not qualified to provide expert testimony regarding his DNA testing of certain items of physical evidence.  Further, the state court record, including the transcript of the post-conviction evidentiary hearing, supports the state court's factual finding that Petitioner presented <u>no</u> evidence in support of this IATC claim, let alone evidence that Mr. Chan was unqualified to testify at trial (*see* Ex. 12 at 156–79, Ex. 13 at 180–352).  Therefore, Petitioner failed to demonstrate that Attorney O'Connell had a meritorious basis to object to either Chan's testimony or admission of the DNA evidence.

Moreover, Petitioner's defense was not that he and the victim did not engage in oral sex and vaginal intercourse on the night in question, but that the sex acts were consensual.   The state court reasonably concluded that Petitioner failed to demonstrate a reasonable probability the jury would have rendered a different verdict if Attorney O'Connell had challenged admission of Mr. Chan's testimony or the DNA evidence.

Case No.: 3:18cv1611/MCR/EMT

Petitioner has failed to demonstrate that the state court's adjudication of the IATC claim presented in Ground Four was based upon an unreasonable determination of the facts in light of the evidence presented to the state court; and he has failed to demonstrate that the state court's adjudication of Ground Four was contrary to or an unreasonable application of *Strickland*. Therefore, Petitioner is not entitled to federal habeas relief on Ground Four.

## V. CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'" *Miller-El v. Cockrell*, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)). "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his

constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" *Buck v. Davis*, 580 U.S.—, 137 S. Ct. 759, 773, 197 L. Ed. 2d 1 (2017) (citing *Miller-El*, 537 U.S. at 327).   The petitioner here cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.      That the petition for writ of habeas corpus (ECF No. 1) be **DENIED**.

2.      That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 22nd  day of July 2019.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**